THOMAS J. PAYNE ET AL., Appellants, *v.* NARCISSA J. PAYNE ET AL., Respondents.

#### January 29, 1878.

The heirs filed a bill in equity to set aside a sale under a deed of trust given by the testator during his lifetime, which alleged that the notes secured by the deed of trust were not owned by the holder, but were, in effect, paid, having been purchased with funds of the estate furnished by the executrix, in pursuance of a fraudulent conspiracy to purchase the realty in fraud of the heirs. The testimony showed that the executrix was the widow of the testator, and entitled, under the will, to a life-interest in all his property, subject to debts; that, during five years of administration, she had, in good faith, and with the knowledge and assent of the heirs, kept the rents as her own, and had applied all the personalty and sold other realty to pay debts; that the notes secured by the deed of trust. were purchased from the original holder by the executrix's daughter, partly with her own money, partly with money of the executrix, and partly with the proceeds of rents of the estate, which the executrix regarded, and which the heirs had permitted her to regard, as her own under the will; that the notes were originally bought for the purpose of saving the property, which was the family residence, from sacrifice, and without any ulterior intention of buying it for the executrix. *Held*, that the validity of the sale depended upon the title to the notes, and that such title depended very largely upon the widow's right to the rents,' a portion of which had been given the daughter, and used in the purchase of the notes; that the bill was not so framed as to give notice that the heirs intended, in this proceeding, to raise the question as to the widow's right to retain the rents and sell realty to pay debts; and that the Circuit Court committed no error in dismissing the bill.

APPEAL from St. Louis Circuit Court.

*Affirmed.*

GEORGE P. STRONG, with JOHN N. STRAAT, for appellants : The personal property is the fund primarily liable for the payment of the debts. This embraces not only debts due the testator in his lifetime, but also rents collected from his tenants after his death by his executor. — *Brant's Will*, 40 Mo. 266 ; *Logan* v. *Caldwell*, 23 Mo. 373 ; Gen. Stat. 1865, p. 493, secs. 48, 49. The executrix was charged with a trust, and could not so use the property as to secure advantage to herself, or to the prejudice of the devisees. — *Jami-*

*son* v. *Glasscock*, 29 Mo. 191; Whart. on Ag., sec. 40; *Mottery* v. *Mottery*, 7 Ired. 221; *Grumley* v. *Webb*, 44 Mo. 452; *Rea* v. *Copelin*, 47 Mo. 83; *Hull* v. *Voorhis*, 45 Mo. 555; *Keach* v. *Sanford*, 1 Ld. Cas. in Eq., mar. p. 44. Nor could she use her own funds to purchase the property. — *Rankin* v. *Porter*, 7 Watts, 387; *Exchange Bank* v. *York*, 4 La. An. 138; *Meeker* v. *York*, 13 La. An. 18; *Estate of Woodward*, 31 Cal. 595; 2 Williams on Ex. 1340, bot. p.; 3 *Id.* 1841, bot. p.

D. T. JEWETT, for respondents.

BAKEWELL, J., delivered the opinion of the court.

This is a proceeding in equity by the children of Thomas J. Payne, deceased, against their step-mother and her daughter and son-in-law, to set aside a sale of a house and lot belonging to Thomas J. Payne at the time of his death, and which were sold under a deed of trust, and purchased by Alfred F. Caldwell, one of the defendants.

The allegations of the bill are, that there came into the hands of the widow, as executrix of the estate of Thomas J. Payne, assets more than sufficient to pay all the debts of the estate; that she confederated with her daughter Eva to purchase the notes secured upon the property in question, in the name of Eva, with money belonging to the estate of Payne; that the notes were not really purchased, but paid by the money of the estate; that, in pursuance of their fraudulent design, the defendants caused the property in question to be advertised under the deed of trust, and sold to defendant Caldwell, under the same, for $2,800; that the property was worth $10,000 at the date of this pretended sale; that, in furtherance of their fraudulent design, defendant Narcissa and her daughter caused the notes secured by the deed of trust to be proved up against the Payne estate in the name of Eva, and are seeking to enforce payment of the same out of the estate; and that plaintiffs did not know, until the sale to Caldwell, that any of the defendants pre-

tended to be creditors of the estate.   The defendants deny that these notes were purchased with the money of the Payne estate, or for any fraudulent purpose ; deny that the defendant Narcissa had assets to pay the debts of the estate without selling the realty ; say that the personal property of the estate has been applied to the payment of the debts ; and that the property in question was necessarily sold to pay debts, and was purchased by Caldwell in good faith.   On hearing, the bill was dismissed ; and plaintiffs appeal.

It appears from the evidence that Thomas J. Payne died in September, 1867.   By his last will, executed about eighteen months before he died, he left all his property in Missouri, both real and personal, to his widow for life ; the remainder of his property, of every description, he left to his three sons by a former wife.   His estate consisted of real property in Missouri and Illinois, and promissory notes inventoried at about $10,000, but worth considerably less, and about $500 in cash.   He was largely indebted, and at the end of five years of administration the personalty was all exhausted, and about $5,000 of allowed demands remained unpaid.   The widow and executrix faithfully applied all the personalty of the estate to the payment of debts, according to the interpretation which she gave to her husband's will, in which all parties interested in the estate seem to have agreed.   She never accounted, in any way, for any of the rents received from the real estate ; these she regarded as her own under the will.   And although, when from time to time she made application to the Probate Court to sell the realty to pay the debts, the attorney of the remainder-men, representing them in the Probate Court, applied more than once to have the orders of sale modified, and though he examined her settlements when made, and successfully applied to the Probate Court to compel her to keep down the taxes on the real estate out of the income from it, there does not seem to have been any opposition to her applying the rents of the real estate in Missouri, as tenant for life

under the will, to her own use; nor does it appear to have been doubted on either side, or by any one concerned, that Mrs. Payne had a perfect right to the net income from the real estate in Missouri.

About the time of Payne's death, a real-estate note, secured by deed of trust upon his residence, on the corner of Chestnut and Fifteenth Streets, in St. Louis, came due. Payne had borrowed $4,000 on the house, which was all outstanding and bearing interest at ten per cent. Mrs. Payne and her only child, the defendant Eva, then unmarried, were living in the house when Payne died. Mrs. Payne appears to have had little capacity for business, and her daughter managed her affairs. They were quite devoted one to the other, and Eva regarded her mother's interests as her own. Mrs. Payne had nothing outside of her interest in her husband's estate, except a house and lot in the suburbs, of little value, renting for about $10 a month, and about $500 in cash, a little *peculium* which she had acquired during the twelve years of her marriage with Payne, from occasional presents from him, and little household economies. Eva had some property, which Mr. Payne had given her during his life, bringing in an income of about $500 a year, and also a sum of $250 inherited from her grandmother. The two women were very anxious to avoid a sale of the Chestnut Street house, in which they lived; and the holder of the notes, one of which was due, was pressing for his money and threatening to sell. Mrs. Payne sold her suburban lot for $1,200, and gave the money to Eva, who added to it as much as she could scrape together of her own, and the $500 in cash that her mother had saved, and set to work to buy up the notes against the Chestnut Street house. She succeeded, to her surprise, in making an arrangement by which she paid $1,550 cash, and bought the notes for their face value, $5,550, in July 1868, borrowing $4,000 through the good offices of a business friend, and pledging the notes to secure the loan. Afterwards, in the course of

time, the amount due upon the notes was wholly paid by Eva, partly with her own money and partly with the money she got from her mother. How the accounts between them stood, or stand, neither of them can exactly tell; and before and since the marriage of the daughter to the defendant Caldwell, they seem to have had their interests in common, and to have considered all questions of money, as between themselves, a farce. All that we can gather from the testimony as to this matter is that, during the three years immediately succeeding the death of Mr. Payne, the two ladies practised the most rigid economy, and, between them, received about $10,000, out of which they lived, and out of which these notes were bought in the name of the daughter. Of this money, about $1,750 seems to have come from the daughter's property, about an equal amount from the separate property of the mother, and something like $6,500 from the income derived from the rents of the Payne estate. They kept no accounts between themselves, but an extremely competent and experienced accountant, making a specialty of probate business, was employed to manage the affairs of the administration, and every thing belonging to the estate was strictly accounted for; no return, however, being ever made, or ever demanded by any one concerned, as to the rents and profits of the real estate. Mrs. Caldwell thinks she borrowed from her mother from $2,100 to $3,600, which she repaid. In December, 1868, an allowance was made in favor of Mrs. Caldwell of $4,410.35 on account of the real-estate notes. In 1872, she was paid $2,792 on her allowed demand. All the personalty of the estate, and almost all the realty also, as it would appear, has been applied to the payment of debts, and there seems to be little left for the widow's life-estate; although, as to that point, there is no evidence from which we can come to any definite conclusion. The house on Chestnut Street was sold, in December, 1875, for the unpaid balance on the notes. The sale was duly advertised in the

*Times* newspaper; there were ten persons present at the sale, of whom two were bidders; the property was bought in by Caldwell for $2,800, that being the highest bid. The real purchaser was Mrs. Eva Caldwell; but she desired that the property should stand in her husband's name. There was no cash paid. The $2,800 was credited on the notes. The evidence is that the house was dilapidated; that there had been a general decline of property; that this property had specially depreciated; that it was in very bad condition as to repairs, the house being cracked from top to bottom. It was worth, at the time of the sale, about $5,000 cash. The sale seems to have been conducted fairly enough.

It is not necessary for us to pass upon the question whether or not the income from the real estate of Payne in Missouri did or did not, under all the circumstances of this case, belong to Mrs. Narcissa Payne; whether it was her duty, as executrix, to account for this revenue in her settlements in the Probate Court, and to apply it to the payment of debts, and thus save the real estate from sale. This is not a proceeding to marshal the assets of the estate; nor is any creditor complaining. In fact, there is no creditor of the estate except Mrs. Caldwell; all other debts are paid. Whether Mrs. Payne was or was not entitled, under her husband's will, to retain the income from the real estate, she evidently thought that she was; and the plaintiffs in this case, the sons of her husband, and their attorney, seem to have conceded that she was right in this view. The estate, with the knowledge of all parties, has most manifestly been administered upon this idea; regular settlements being made yearly, with minute details of every receipt and expenditure, and applications having been made and granted for the sale of the realty to pay debts, without any suggestion from any one that the rents should be applied to the payment of the debts. Indeed, there is no suggestion in the present bill that this use of the rents by the widow was a misapplication of the funds of the estate.

There is no evidence in the case whatever of any actual fraud, of any fraudulent intent, or of any thing that was not honest and straightforward in the conduct of any one of the defendants; as to whom the evidence seems to be, however, that they have a common purse, common interests, and keep no accounts as to money-dealings between themselves, having implicit confidence each in the other. The only question is, whether this purchase of these notes by Mrs. Caldwell, then Miss Eva Bryant, with money belonging partly to her mother and partly to herself, and largely with a view to her mother's interests, and to prevent, as she thought, the loss of property in which her mother had a life-estate, was a fraud in law upon the other distributees of the estate, of such a character that a court of equity ought to interfere to set aside this sale. It is true that one in a fiduciary capacity cannot use his own funds to speculate in the purchase or sale of property which he holds or controls as trustee; but nothing of that kind seems to have been done. The notes were purchased in good faith by the joint exertions and sacrifices of these two women, to prevent what they supposed would be a sacrifice of this property by a forced sale. The testimony is that they had not, at the time, the faintest idea of acquiring title to the property through the notes, and no reason appears why Miss Bryant might not buy these notes with money borrowed partly from her mother. The notes being, then, purchased by her, and it becoming apparent in the course of the administration that the estate could not pay the debts without recourse to the realty, we see nothing inequitable in the fact that the Caldwells proceeded, after the lapse of six years, during which this property had steadily depreciated, to foreclose the deed of trust. There is no evidence in the case tending to show that a better price could have been obtained had the sale been made under the order of the Probate Court. This sale can be set aside only on the ground that, in equity, Miss Bryant

acquired no title when she purchased these notes from the creditor of her step-father, with the knowledge of the executrix, and with money partly borrowed from her. There is no evidence that Miss Bryant was not in good faith the real purchaser of the notes, and we do not think that the mere fact that a considerable amount of the purchase-money was borrowed from her mother ought to avail to set aside the sale. It does not appear that Mrs. Payne ever owned the notes, either in whole or in part, and we do not think that this bill is so framed as to raise the question whether or not the rents of the realty were assets in the hands of Mrs. Payne which should have been applied to the payment of the debts of the estate. Nor do we see what decree could be rendered in this case, on the evidence, which would protect the rights of all parties if the deed should be set aside. If the title of Mrs. Caldwell to this note is good, there is no pretence for attacking the deed of foreclosure; but if her title is not good, and the note is held by her as trustee for the estate of Payne, it must be that she bought it, not with her own money, but, partly at least, with money belonging to the Payne estate, lent to her or given to her by the executrix. This is not so if Mrs. Payne, under her husband's will, was entitled to receive and retain as her own, against the remainder-men, the rents and profits of the real estate in Missouri. This she had done, without any objection or opposition from them, ever since she had charge of the estate; and we do not think the allegations of this bill afford any notice to her that the question of her perfect right to do so would or could be raised in the present proceeding. She might well suppose that the charge she was called upon to meet in this action was, that she had applied a portion of the inventoried assets of the estate, or of assets with which she had charged herself in her settlements, to the purchase of this note. Such seems to have been the idea in the mind of the attorney of the remainder-men, who drew the bill,

and who, as his testimony shows, is familiar with all the proceedings in this estate from the time of Payne's death. If the deed is to be set aside on that ground, the issue should have been fairly presented, and then in such a shape that on reference to a master, if it should be determined that Mrs. Payne was bound to account for the rents received, it might be ascertained what moneys of the estate, if any, had been improperly given or loaned by Mrs. Payne to her daughter, and what proportion of these notes belongs to the estate, and what proportion to Mrs. Caldwell. Was the Circuit Court simply to set aside the deed of foreclosure? And if it did so, how far, under the pleadings in this case, would the question of Mrs. Payne's rights to these notes become *res adjudicata* by such a decision? If the assets are to be marshalled, has Mrs. Payne no rights that are to be respected? If the rents had been applied to the payment of debts, it is to be presumed that a considerable portion of the realty, in which she had the exclusive present beneficial interest under the will, and which has been sold, would have remained to her. If the question of her right to these rents is to be raised, it should be raised directly, and in such a way that her equities may be protected, and that she may not lose at once the property which might produce her a revenue on which to live, and the revenue which she has received from that property in the past. Nothing whatever is said in Payne's will as to the payment of debts, and it is difficult to believe that he intended to leave his wife wholly without revenue until the debts were paid; but if that is a fair interpretation of the will, it should not be made a mere incident in a proceeding such as this, without argument and without notice. In short, the equity of this bill is its attempt to reach in the hands of a third person trust funds that were to be administered by the executrix for the benefit of all persons interested in them, and which, by fraudulent collusion with the executrix, have been misapplied. Under

the guise of attacking the deed to Caldwell, it really attacks the title to the notes. There is no specific allegation in the bill that the funds thus misapplied are the rents of the realty; and the evidence shows that the executrix had every reason to believe, from the conduct of plaintiffs, that they entirely recognized her right to retain these rents and acquiesced in her doing so, and in the sale of the realty to pay the debts; and she could not be prepared, in this action, to meet the question whether or not these rents were her own. If they were, we see no sufficient reason why she might not give them to her daughter, and why her daughter might not, with them, buy up a mortgage upon a portion of the revenue-producing property of the estate, in which her mother had the entire beneficial interest for life, when this course seemed necessary to prevent a total loss of that property to the estate. But if the daughter could buy up the mortgage-debt, her right, subsequently, to enforce its collection, if she chose to do so, seems to be quite clear.

On the whole, we are of opinion that the Circuit Court committed no error in dismissing this bill, and its judgment is affirmed. All the judges concur.